UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 21bk05434 |
| Justin S. Fara, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Chop Foo, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 21ap00117 |
| | ) | |
| v. | ) | Judge Timothy A. Barnes |
| | ) | |
| Justin S. Fara, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION[1]

   The matter before the court arises out of the Amended Adversary Complaint to Determine Non-Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6) [Adv. Dkt. No. 58] (the "Amended Complaint"), filed by Chop Foo, LLC (the "Plaintiff"), in the above-captioned adversary case (the "Adversary").[2]  The Amended Complaint seeks, pursuant to sections 523(a)(2)(A), 523(a)(4) and 523(a)(6) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), a determination of nondischargeability of debt allegedly owed to the Plaintiff by Justin S. Fara (the "Debtor") arising out of an obligation of BJ Construction, LLC ("BJC"), to the Plaintiff established pursuant to a judgment entered against BJC in favor of the Plaintiff.

---

[1]  This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure (the "Civil Rules" and, as to each, "Civil Rule ___"), made applicable to these proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, as to each, "Bankruptcy Rule ___").  A separate judgment will be entered pursuant to Bankruptcy Rule 9021 and in accordance with Civil Rule 58(a), made applicable in these proceedings by Bankruptcy Rule 7058.

[2]  References to docket entries in this Adversary will be noted as "Adv. Dkt. No. ___."  References to docket entries in the underlying bankruptcy case, *In re Justin S. Fara*, Case No. 21bk05434 (Bankr. N.D. Ill. filed July 23, 2021) (Barnes, J.), will be noted as "Dkt. No. ___."  References to exhibits in this Adversary will be noted as "Px. ___" (in the case of Plaintiff's exhibits) or "Dx. ___" (in the case of Defendant's exhibits), as applicable.

For the reasons more fully stated below, judgment will be entered in favor of the Debtor on all counts of the Amended Complaint on which the parties proceed to trial. The Plaintiff has failed to elevate its Amended Complaint beyond that of a simple contract dispute. The obligations owed by and paid by the Plaintiff were ones pursuant to a contract, the propriety of which contract the Plaintiff does not challenge. Payments made by the Plaintiff were pursuant to that contract. While it does appear that the Debtor (and BJC thereby) made certain misrepresentations in the course of the contract, the payment of the monies involved was not obtained by such misrepresentations so as to satisfy section 523(a)(2)(A) of the Bankruptcy Code. Nothing in the Supreme Court's recent decision of *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023), upsets the case law in this regard. Further, the Plaintiff has failed to establish the elements of section 523(a)(4). While the court does not condone the sloppy business practices of the Debtor and the puffery engaged in in his business relationship with the Plaintiff, those alone do not satisfy the statute.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A judge of the bankruptcy court to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Such judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the judge may hear the matters, but may not decide them without the consent of the parties. 23 U.S.C. §§ 157(b)(1), (c). For matters only related to a bankruptcy case, absent consent, the judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a judge of the bankruptcy court must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy judge hearing and determining the matter. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

As a complaint opposing dischargeability of a debt arises only in relation to a bankruptcy case, this matter is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I). In accordance with *Stern*, 564 U.S. at 499, a bankruptcy court judge has authority to decide matters of

2

nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself. "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *Parkway Bank & Tr. v. Casali* (*In re Casali*), 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.); *see also Wan Ho Indus. Co., Ltd. v. Hemken* (*In re Hemken*), 513 B.R. 344, 350 (Bankr. E.D. Wis. 2014). Further, each of the parties has either expressly or impliedly consented to the undersigned's exercise of authority over this matter.

As a result, there exists jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on the Amended Complaint.

BACKGROUND

On October 3, 2018, the Plaintiff and BJC entered into a contract, followed by a rider on October 5, 2018 (together, the "Contract"), for BJC to make improvements to a property owned by the Plaintiff (the "Project"). Joint Pretrial Statement [Adv. Dkt. No. 73] (the "Pretrial Statement"), Stipulated Facts (the "Stipulated Facts"), at ¶¶ 2-3. The Debtor, as the sole member, sole manager, sole investor and active principal of BJC, negotiated the Contract with the Plaintiff. *Id.* at ¶ 1. The Contract contained a specific payment schedule wherein payments were to be made at various percentages of project completion. Stipulated Facts, at ¶ 4. How those percentages were to be calculated was undefined.[3] The Contract did not, however, contain any provision that would require BJC to deposit the payments into an escrow or trust account, nor did the Debtor ever offer to deposit payments made to BJC into any such account. *Id.* at ¶¶ 5-6.

In October of 2018, BJC began working on the Project. *Id.* at ¶ 7. Beginning in October of 2018, and continuing through January of 2019, the Plaintiff made a series of five separate payments to BJC (the "Contract Payments"), "each at the request and/or direction of [the Debtor] and/or others operating under his direction." *Id.* at ¶¶ 8–12. The Contract Payments were made on the days and in the amounts that follow:

| | | |
|---|---|---|
| 1. | October 5, 2018: | $62,142.75 |
| 2. | October 29, 2018: | $63,709.35 |
| 3. | November 28, 2018: | $124,285.20 |
| 4. | December 27, 2018: | $21,167.00[4] |
| 5. | January 31, 2019: | $124,285.00 |

*Id.*

Before the Project was completed, disputes arose between the Plaintiff and BJC, and in July of 2019, the Plaintiff terminated BJC from the Project. *Id.* at ¶¶ 14–15. On May 27, 2020, the Plaintiff filed a lawsuit in state court against BJC wherein the Plaintiff sought to recover its damages pursuant to the Contract (the "State Court Action"). *Chop Foo, LLC v. BJ Construction Group, LLC*, Case No. 20 L 005662 (January 8, 2021); Stipulated Facts, at ¶ 16.

---

[3]     There appears that there may have been a schedule that might provide guidance in that regard, but such schedule was either not provided to the court or, if it was, was not relied on by the Plaintiff in advancing its arguments.

[4]     Unlike the other payments, this payment appears to have been solely for the costs of certain changes.

BJC was involuntarily dissolved during the pendency of the State Court Action. *Id.* at ¶ 17. On January 8, 2021, a default judgment in the amount of $620,847.60 (the "State Court Judgment" or the "Judgment") in favor of the Plaintiff and against BJC was entered in the State Court Action. *Id.* at ¶ 19. Subsequently, the Plaintiff attempted, unsuccessfully, to collect the Judgment from BJC. *Id.* at ¶¶ 20–21.

On April 26, 2021, the Debtor filed a chapter 7 bankruptcy petition in this court (the "Petition"), the result of which would have been, absent an action such as the one at bar, to discharge any obligation he might have on the Judgment. *Id.* at ¶¶ 22-23. On July 23, 2021, the Plaintiff commenced this adversary proceeding to determine nondischargeability of the Judgment. *Id.* at ¶ 24.

PROCEDURAL HISTORY

The Plaintiff filed the Amended Complaint on March 1, 2023, seeking a determination of nondischargeability with respect to any personal liability the Debtor may have with respect to the Judgment (the "Debt"). Amend. Compl., at ¶ 1. In the Amended Complaint, the Plaintiff seeks relief in three counts (the "Counts" and as to each, "Count __"), as follows:

Count I:     That the Debt be found exempt from discharge to the extent it was obtained by false pretenses and/or false representation under 11 U.S.C. § 523(a)(2)(A);

Count II:    That the Debt be found exempt from discharge to the extent it was obtained "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" under 11 U.S.C. § 523(a)(4); and

Count III:   That the Debt be found exempt from discharge to the extent it was obtained "for willful and malicious injury by the debtor to another entity or the property of another entity" under 11 U.S.C. § 523(a)(6).

In Count I of the Amended Complaint, the Plaintiff argues that the Debt due to it from BJC is nondischargeable as against the Debtor under section 532(a)(2)(A) because the Debt was incurred by false pretenses and/or false representation made by the Debtor. Amend. Compl., at ¶¶ 29–31; Plaintiff's Pretrial Brief, p. 4. The Plaintiff alleges that the Debtor, on behalf of BJC as a principal, negotiated and executed the Contract to induce the Plaintiff to make the Contract Payments. Amend. Compl., at ¶¶ 30–31. The Plaintiff further alleges that the Debtor or employees of BJC acting at the Debtor's direction knowingly made false statements with respect to the progress of the Project to induce the Plaintiff to make the Contract Payments on multiple occasions and that the Plaintiff made such Contract Payments in reliance thereupon. *Id.* at ¶¶ 32–35. The Plaintiff alleges that the Contract Payments it made were appropriated for the Debtor's personal use or for BJC's other projects, rather than for the items that BJC had told the Plaintiff the Contract Payments were to be used for. *Id.* at ¶¶ 36–37. The Plaintiff argues that the Debtor used BJC to effectuate a scheme to use funds from customers for improper purposes, wherein the Debtor knowingly made false representations to the Plaintiff and other customers of BJC with respect to completion of projects and the Debtor's intended use of the payments in order to collect payments. *Id.* at ¶¶ 38–40. The Plaintiff argues therefore that the debt BJC owes to the Plaintiff is rendered nondischargeable as against the Debtor by the Debtor's conduct surrounding the Contract and Contract Payments. *Id.* at ¶ 41.

4

Count II of the Amended Complaint seeks a finding that the Debt due to the Plaintiff is nondischargeable under section 523(a)(4) because it was obtained by embezzlement and the Debtor's engagement in fraud or defalcation while acting in a fiduciary capacity. *Id.* at ¶¶ 43–48; Plaintiff's Pretrial Brief, p. 8. The Plaintiff alleges that the Debtor and BJC itemized upcoming expenditures for the Project to induce the Plaintiff to make the Contract Payments, which the Plaintiff made in reliance on the statements made by the Debtor and employees of BJC. Amend. Compl., at ¶¶ 44, 46. The Plaintiff further alleges that the Contract Payments it made were utilized by the Debtor and BJC for the Debtor's personal use, as well as to pay expenses in relation to BJC's other projects. *Id.* at ¶ 47. The Plaintiff therefore argues that the debt BJC owes to the Plaintiff is rendered nondischargeable as to the Debtor by "use of the Contract Payments for anything other than the work specified by the Contract." *Id.* at ¶ 48.

As to Count III, on April 5, 2023, the Debtor filed Defendant's Motion to Dismiss Adversary Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) [Adv. Dkt. No. 59] (the "Motion to Dismiss"). The court ordered briefing on the Motion to Dismiss, see [Scheduling] Order [Adv. Dkt. No. 63], and after the completion thereof conducted a hearing on June 7, 2023, on the Motion to Dismiss. The court ultimately denied the Motion to Dismiss with respect to Counts I and II but granted the Motion to Dismiss with respect to Count III, dismissing the Count without prejudice but with leave to amend. Order Granting in Part, Denying in Part Motion to Dismiss Adversary [Adv. Dkt. No. 66] (the "Dismissal Order"). Per the Dismissal Order, the Plaintiff was permitted to file a second amended complaint within twenty-one days of the entry of the Dismissal Order. *Id.* As the Plaintiff did not further amend the Amended Complaint by June 29, 2023, twenty-one days after the date of the order, the dismissal of Count III is final and Count III is no longer under consideration. *Id.*

On July 30, 2023, the Debtor filed his Answer to Plaintiff's Amended Complaint to Determine Non-Dischargeability of Debt [Adv. Dkt. No. 67] (the "Answer"). Through the Answer, the Debtor denies that his conduct surrounding the Contract and Contract Payments made BJC's debt nondischargeable as to the Debtor. Answer at ¶ 41. He also denies that he knowingly made false statements with respect to the progress of the Project and directed BJC employees to do the same. *Id.* at ¶ 32. The Debtor denies that the Contract Payments were appropriated for his personal use or for other BJC projects. *Id.* at ¶¶ 36–37. The Debtor also denies that he used BJC to effectuate a scheme to use funds from customers for improper purposes, wherein, to collect payments, the Debtor knowingly made false representations to the Plaintiff and other customers of BJC regarding completion of projects and the Debtor's intended use of the payments. *Id.* at ¶¶ 38–40. He denies inducing the Plaintiff to make the Contract Payment with itemized upcoming expenditures. *Id.* at ¶ 46. Further, the Debtor denies the utilization of Contract Payments for his personal use and to pay expenses in relation to other BJC projects. *Id.* at ¶ 47.

## THE TRIAL AND THE EVIDENTIARY AND TRIAL RULINGS

On August 16, 2023, the court entered a pretrial scheduling order. Trial Scheduling Order [Adv. Dkt. No. 70] (the "Pretrial Order"). Pursuant to the Pretrial Order, the parties were required to submit the Pretrial Statement, which included a statement of stipulated facts, a statement of disputed material facts and lists of witnesses and exhibits that each party planned to offer into evidence at the trial on November 20 and 21, 2023 (the "Trial"). *Id.* at ¶ 3. The parties were also required to make note of any objection to witnesses and/or exhibits and the grounds for any objection. *Id.* By the express terms of the Pretrial Order, all exhibits to which no objections were

raised in the pretrial statements would be admitted into evidence without the need to establish foundation and the failure to assert an objection would result in the waiver of any prehearing or evidentiary objections that could have been raised by such deadline. *Id.* at ¶ 7. Despite the admission of exhibits by default, the Pretrial Order also provided that if the parties failed to use any exhibit at the Trial, the court would not consider that exhibit to be relevant. *Id.*

As required by the Pretrial Order, on November 6, 2023, the parties filed the Pretrial Statement. Among other things, the Pretrial Statement contained the Stipulated Facts referenced above. In the Pretrial Statement, the Plaintiff proposed fourteen exhibits and the Debtor proposed eighteen exhibits. *Id.* at pp. 10-12.

The Pretrial Statement set out a number of the Debtor's objections to the Plaintiff's proposed exhibits. *Id.* at pp. 11-12. All told, the Debtor objected to thirteen of the Plaintiff's eighteen exhibits, raising objections varying from foundation and hearsay to relevance and "lack of personal knowledge." *Id.* The Debtor also objected to one of the Plaintiff's witnesses, Tomer Blackburn ("Blackburn"), as the Plaintiff indicated it wished to offer Blackburn's testimony by deposition excerpts. *Id.* The Plaintiff raised no evidentiary objections in the Pretrial Statement.

On November 8, 2023, the court conducted a pretrial conference (the "Pretrial Conference") and considered then the Debtor's objections. At that time, the court confirmed that any exhibit without an objection noted in the Pretrial Statement was automatically admitted[5] and took up the Debtor's objection to the designated deposition testimony of Blackburn. As to that objection, as was represented by the Plaintiff's counsel at the Pretrial Conference, Blackburn was unavailable for the Trial because he was out of the country at that time. Counsel for the Debtor expressed at the Pretrial Conference that his objections to the testimony were limited to whether such designated testimony was appropriate and relevant and how that designated testimony would proceed if allowed. The court overruled the relevance objection and ruled in favor of the Plaintiff on the admissibility question as the unavailability of Blackburn appeared to meet the requirements for the same. *See* Fed. R. Evid. 804(a).[6] It was agreed by the parties that the Blackburn Deposition could be

---

[5]    Once again, however, the court noted that the admission of an exhibit alone would not result in it automatically being afforded any weight. It is up to the exhibit's proponent to use the admitted exhibit in such a way that affords it weight.

[6]    On reflection, that conclusion was not without some controversy. As will be noted below, while the court in a bench trial has more latitude to consider and weigh questionable evidence than one charged with protecting a jury from prejudice, that latitude is not without limits. Still, as the witness was out of the country and therefore absent from the Trial and as it was not reasonable to force his attendance or reschedule the Trial under such circumstances led to that conclusion, though on its face such limited unavailability may not qualify as true unavailability under the Federal Rules of Evidence. *See* Fed. R. Evid. 804(a)(5)(A) & (a)(2). As an employee of an entity alleged to be the alter ego of the Debtor, it is also conceivable that the Blackburn's testimony was not hearsay at all. Fed. R. Evid. 801(d)(2). Finally, it should be noted that it appears from the transcript in question, *see* Px. 14 (Deposition of Tomer Blackburn) (the "Blackburn Deposition"), that counsel for the Debtor knew of the Blackburn Deposition and declined to attend. *See* Blackburn Deposition, pp. 5–6; Fed. R. Evid. 804(b)(1). If challenged, each of these grounds is tenuous, at best. Other than his initial question, however, counsel for the Debtor did not argue against the admission of the Blackburn Deposition and appeared to concede its admissibility. As will be seen below, however, the testimony of Blackburn was not given great weight by the court for other reasons and does not play a role in the outcome of this matter.

offered through deposition designations from the Plaintiff and the reading of those designations into the record so long as Debtor was afforded the opportunity to make counter designations and read those counter designations into the record.

Other than as to the witness, all remaining objections raised were preserved to be handled at the Trial.[7]

As noted above, the court conducted the Trial on the matter on November 20 and 21, 2023.[8] During the Trial, one of the preserved objections was reasserted. The Plaintiff objected to the use of Debtor's Exhibit 3, a series of photos of the Project. The provenance of the photos was unclear and their general admission was opposed. The parties, however, agreed that the exhibit could be admitted for the limited purpose of reflecting the state of the Project, but not on any particular date. Tr., vol. 2, pp. 459–63. As a result, Debtor's Exhibit 3 was admitted for that limited purpose.

During the Trial, the court heard from five witnesses, as follows:

> For the Plaintiff:
>
> > Michael Mertz ("Mertz"), a principal of the Plaintiff;
> > Bradley Weiner ("Weiner"), a former client of BJC;
> > Justin S. Fara, the Debtor; and
> > Blackburn, a former employee of BJC via the Blackburn Deposition.

---

[7] While it is common for parties to raise a variety of objections in order to preserve issues for a possible later appeal, objections based on rules that seek to shelter juries from cumulative, misleading or other problematic evidence are ordinarily of little use in a bench trial. The judge, as both the trier of the law and the finder of fact, must consider the questioned evidence in order to make any ruling, and, in any event, such objections result in the judge considering the evidence to resolve the same. *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F.Supp.2d 1011, 1042 (N.D. Ill. 2003) (Posner, J.) ("The court in a bench trial may 'admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled.'"), *aff'd*, 365 F.3d 1306 (Fed. Cir. 2004), *opinion vacated on reh'g en banc and aff'd on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005). As a result, objections based on relevance, weight, prejudice, cumulative evidence, or potential confusion are not effective grounds for exclusion in a bench trial. *In re Kimball Hill, Inc.*, 595 B.R. 84, 92 (Bankr. N.D. Ill. 2019) (Barnes, J.), *vacated in part sub nom. Fid. & Deposit Co. of Maryland v. TRG Venture Two, LLC*, 19 C 389, 2019 WL 5208853 (N.D. Ill. Oct. 16, 2019), *and order reinstated*, 620 B.R. 894 (Bankr. N.D. Ill. 2020) (Barnes, J.); *Schaumburg Bank & Trust Co. v. Hartford (In re Hartford)*, 525 B.R. 895, 900 n.1 (Bankr. N.D. Ill. 2015) (Barnes, J.). Further, objections based on matters that stem from the use of evidence (*e.g.*, hearsay) cannot generally be ruled on in advance of a trial. The objection must be considered at the time of the use in order to fully consider the evidence's propriety.

[8] A transcript for the Trial was produced and is relied on and cited to herein by the court (the "Transcript"). Such Transcript is problematic in several respects. The court can find no indication that the Transcript was filed on the docket of the case or subject to a review and revision period by the parties. Further, volume 2 of the Transcript is not paginated and the court has had to extrapolate pagination from Adobe Acrobat. The court also had to locate manually within the Transcript the cross-examination of Blackburn, which was done by counsel for the Debtor, by expanding deposition portions previously relied on by counsel to the Plaintiff, as the Transcript had no reference to that in its table of contents. Finally, the Transcript has no glossary of terms used. Nonetheless, as it is the only source available to the court, the court has used it (though its use significantly delayed this Memorandum Opinion). Citations to the Transcript herein are in format of "Tr., vol. [1 or 2], pp. [X–Y]".

For the Debtor:

Justin S. Fara, the Debtor.

Mertz's testimony is, of course, relevant, as it had to with the facts and circumstances directly underlying the Amended Complaint in this Adversary. It is, however, not without issue. Mertz appeared unwilling to accept that the work in question changed not because of the allegations he makes against BJC and the Debtor, but instead due to late discovered defects in the Project. That Mertz is unhappy was clear in his testimony. He had good reason to be. The Project did not go according to plan and the result was a significant added expense and delay. Mertz appears to lay most if not all of the blame for that at the feet of the Debtor, *see, e.g.*, Tr., vol. 1, pp. 59–64, which is both unreasonable and belied by the facts. *United States v. Austin*, 806 F.3d 425, 431 (7th Cir.2015) ("The [trial] court is best situated to make credibility determinations in light of the totality of the evidence, including the witness's statements and behavior, other witness statements, and corroborating or contrary evidence."). As a result, Mertz's testimony is less than ideal in its credibility.

Less helpful was the testimony of Weiner. That the Plaintiff was able to locate another disgruntled client of BJC is hardly surprising given BJC's sloppy business practices and the fact that the public in general has grown more inclined to lay blame on others for the things that happen to them. It is, however, not relevant to the matter before the court. While the Plaintiff has alleged that the Debtor conducted a scheme that crossed multiple matters, it has not shown how such a scheme, should one exist, would be of relevance here. What is relevant is the Debt allegedly owed by the Debtor. Even where a scheme to exist, one other disgruntled customer doesn't show its existence. In truth, the Plaintiff appears to be trying to establish a course of conduct that expands beyond the scope of the matter before the court to impermissibly impugn the Debtor's character through past acts. *See* Fed. R. Evid. 404(b)(1). The court fails to see any exception that would allow this testimony. *See* Fed. R. Evid. 404(b)(2). The court also struggles to see the relevance. *See, e.g.*, *In re Faruque*, Case No. 07-13375-SSM, 2009 WL 2211210, at *4 (Bankr. E.D. Va. July 20, 2009) ("[M]erely because a debtor is a bad person, as the plaintiff alleges, is not a ground for excluding a particular debt from discharge …."). As such, the court gives little or no weight to the testimony of Weiner.[9]

Blackburn's testimony was the most problematic of all. In the Blackburn Deposition, it quickly becomes evident that Blackburn is testifying in a manner to minimize his own culpability. For example, in each instance in which he was asked about the scope of his duties as project and then general manager, he responded that essentially all decisions were made by the Debtor. *See, e.g.*, Tr., vol. 2, pp. 348–49. As a necessary result, he lays blame on the Debtor for any miscommunications that might have occurred. Further, without the benefit of cross-examination, the court is not afforded a full understanding of the bases of Blackburn's conclusions. The court is left with a high degree of skepticism regarding Blackburn's testimony.

---

[9]     As alluded to above, there are circumstances in which such testimony might have relevance. For example, had the Debtor testified that he would never have done the alleged acts, this might be useful to impeach that testimony. But Weiner testified first, and, for the most part, the Debtor here does not challenge Weiner's recitation of the facts, only the conclusions drawn from them.

Finally, the Debtor's testimony was frankly the most forthright and convincing.  As to Blackburn's authority, the Debtor's testimony contradicted Blackburn's. Tr., vol. 1, pp. 161–64. For the reasons noted above and below, the court is inclined to believe the Debtor over Blackburn where the two conflict.  The Debtor did not argue or seek to quibble over facts.  He offered his explanation of what had occurred and left it to the court to draw its own conclusions.  Of all the witnesses, the Debtor was the most credible.

Also, during the Trial, the Debtor moved by oral motion for judgment on partial findings (the "MJPF") pursuant to Civil Rule 52[10] "on the basis of failure of plaintiff to provide either argument or evidence to justify piercing the corporate veil and establishing a relationship between the contractual parties of Chop Foo and BJ Construction." Tr., vol. 2, p. 391.  The Debtor argued that rather than pleading the issue of piercing the corporate veil in its pretrial brief, the Plaintiff issued only "a conclusory statement saying that … Justin Fara, through BJ Construction, participated in the tortious actions of BJ Construction." *Id.*  In response, the Plaintiff argued that the Debtor failed to cite any law in support of the MJPF. *Id.* at pp. 391–93.

The court declined to rule on the MJPF at that time, instead opting to delay judgment until the close of evidence.  Fed. R. Civ. P. 52(c) ("The court may, however, decline to render any judgment until the close of the evidence.").  Despite that determination, the court did rule that, pursuant to Civil Rule 15,[11] the issue of piercing the corporate veil was, indeed, at issue for the court to determine in the Trial despite no specific Count in that regard being included in the Amended Complaint or the issue being specifically addressed in the Pretrial Statement.  Because each of the Plaintiff's Counts is clearly predicated on a veil-piercing finding, there is no prejudice to the Debtor to allow the Plaintiff to proceed on that theory.  The Debtor had a fair opportunity to prepare for and defend what he knew was at issue and made no argument that, had this been included in a separate Count, he would have presented additional evidence or prepared for the Trial differently. Indeed, some evidence in support of piercing the veil had been presented by the Plaintiff in the Trial. Tr., vol. 2, pp. 393–94.  Thus, in declining to rule separately on the MJPF, the court reserved the issue of piercing the corporate veil for its ultimate determination at the close of evidence, pursuant to Civil Rule 52(c). *Id.* at 395.  As a result of the decision in this Memorandum Decision rendering judgment after trial, the MJPF is rendered moot. *Watkins v. United States Dist. Ct. for the Cent. Dist. of Illinois*, 37 F.4th 453, 457 (7th Cir. 2022) (A claim becomes moot "when it is impossible for a court to grant any effectual relief.") (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013); *see also*

---

[10]     Made applicable to these proceeding by Bankruptcy Rule 7052.

[11]     Made applicable to these proceeding by Bankruptcy Rule 7015.  "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue." Fed. R. Civ. P. 15.  In determining whether there was implied consent, a court must determine "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Rivinius, Inc. v. Cross Mfg., Inc.* (*In re Rivinius, Inc.*), 977 F.2d 1171, 1175 (7th Cir. 1992) (internal quotation omitted).  "A court will not imply a party's consent to try an unpleaded claim 'merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.'" *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) (*quoting Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988)).

*Trinity 83 Dev., LLC v. ColFin Midwest Funding, LLC*, 917 F.3d 599, 601 (7th Cir. 2019) ("Mootness is a constitutional doctrine designed to avoid the issuance of advisory opinions.").

At the conclusion of the Trial, the matter was taken under advisement. This Memorandum Decision constitutes the court's determination after the Trial of the matters in the Amended Complaint and concludes all open issues in the Adversary, including, as applicable, the MJPF.

FINDINGS OF FACT[12]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial and the filings in this Adversary, the court determines the salient facts to be and so finds as follows:

1.   During the time periods in question herein, the Debtor was the sole member, sole manager and sole investor and active principal of BJC, a construction company. Stipulated Facts, at ¶ 1.

2.   On October 3, 2018, the Plaintiff and BJC entered into the Contract (as amended by a rider thereto entered into October 5, 2018). *Id.* at ¶ 2.

3.   The Contract called for BJC to make improvements to the Project, a property owned by the Plaintiff, located at 1560 N. Damen, in Chicago, Illinois. *Id.* at ¶ 3.

4.   The Contract contained a specific payment schedule based upon percentages of project completion. *Id.* at ¶ 4.

5.   The Contract contains no language requiring BJC to deposit any of the payments into any sort of escrow account or trust account. *Id.* at ¶ 5.

6.   The Debtor, as the contractor and drafter of the contract, never offered to deposit any of the payments delivered to BJC in any sort of escrow account or trust account. *Id.* at ¶ 6.

7.   BJC began working on the Project in October of 2018. *Id.* at ¶ 7.

8.   Beginning on October 5, 2018, and ending on January 31, 2019, the Plaintiff paid BJC a series of Payments. *Id.* at ¶¶ 8-12.

9.   The Plaintiff made these Payments at the request and/or direction of the Debtor and/or others operating under his direction. *Id.*

10.  On October 5, 2018, the Plaintiff paid BJC $62,142.75 (the "Initial Deposit"). *Id.* at ¶ 8.

11.  On October 29, 2018, the Plaintiff paid BJC $63,709.35 (the "First Payment"). *Id.* at ¶ 9.

---

[12]   Adjudicative facts may also be found and determined throughout this Memorandum Decision. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

12.	On November 2, 2018, Blackburn paid $8,000.00 to subcontractor CE Construction on behalf of BJC for "demo" for an invoice dated October 30, 2018.  Px. 1.

13.	On November 28, 2018, the Plaintiff paid BJC $124,285.20 (the "Second Payment"). Pretrial Stmt., at ¶ 10.

14.	Prior to the remittance of Second Payment, on November 27, 2018, Blackburn/BJC made a request for the same.  Px. 6 (the "Request for Second Payment").  The Request for Second Payment stated that the framing portion of the CF Project was "approaching completion" and that the next phase of the project "includes plumbing, HVAC, and electric."  *Id.*  The Request for Second Payment stated that BJC would "need to start providing [BJC's subcontractors] their first payments to begin their work" and that BJC would "be placing orders for windows."  *Id.*

15.	On December 27, 2018, the Plaintiff paid BJC $21,167.00 (the "Change Order Payment"), Pretrial Stmt., at ¶ 11, in response to BJC's request for a change order due to fire damage discovered during demolition. Tr., vol. 2, p. 428.

16.	On January 31, 2019, the Plaintiff paid BJC $124,285.00 (the "Third Payment"). Pretrial Stmt., at ¶ 12.

17.	Prior to the Third Payment, on January 24, 2019, Blackburn, on behalf of BJC, requested remittance of the Third Payment from Mertz on behalf of the Plaintiff. Px. 7 (the "Request for Third Payment").  The Request for Third Payment stated that BJC was "near completion of the framing of both units" and that "the MEP (mechanical, electrical, plumbing) trades …[had] all received their initial deposits and [would] now be needing their second payments before beginning their work (50% of their total contract cost)."  *Id.*  The Request for Third Payment stated that BJC planned "to have HVAC start [the] next week, followed quickly after by plumbing and electric."  *Id.*

18.	During the period after the Plaintiff made the Second Payment to and including the Third Payment Request from the Plaintiff, BJC tendered three payments, a total of $17,100.00, to one subcontractor, CE Construction.  Px. 1.

19.	In the period after it received the Third Payment from the Plaintiff on January 31, 2019, to and including January 28, 2020, BJC tendered 15 payments, a total of $64,025.00, to eight subcontractors.  Px. 1.  Two of BJC's payments to subcontractors were tendered after BJC was fired from the CF Project.  *See id.*; Pretrial Stmt., at ¶ 15.

20.	In total, the Plaintiff made $395,589.30 in payments to BJC.  *Id.*

21.	Each request by BJC for payment under its Contract with the Plaintiff was made pursuant to the progress schedule laid out in the Contract executed by the parties. Px. 4.

22.	In total, BJC tendered $81,125.00 to nine subcontractors associated with the CF Project.  Px. 1.

23.	On several occasions, the facts make clear that the Debtor withdrew funds for personal use. Tr., vol 1, at p. 257.

11

24. BJC utilized one main bank account to deposit funds from clients as well as to pay all of its expenses, including payment of subcontractors and its payroll, purchase of materials, and other miscellaneous operating expenses. *Id.* at pp. 221–23.

25. The Plaintiff alleges that before BJC deposited the Initial Deposit on October 8, 2018, BJC's ledger reflected a negative account balance, *id.* at pp. 224–25, but BJC's account statement reflects that the daily ending balance was positive immediately prior to the Initial Deposit. Px. 12.

26. The Plaintiff alleges that on November 25, 2018, prior to the Second Request for Payment, BJC's ledger reflected a negative account balance. Tr., vol. 2, pp. 156–57. While BJC's account statement reflects that the daily ending balance on November 25, 2018, was ($2,566.65), the daily ending balance was positive when the Second Payment Request was made on November 27, 2018. Px. 12.

27. The Plaintiff alleges that BJC's ledger reflected a negative balance within days of the deposit of the Second Payment, Tr. Vol 2, p. 557, however, the account statement reflects positive daily ending balances for all the remaining days of November and December of 2018. Px. 12.

28. The Plaintiff alleges that following the deposit of the Fourth Payment on January 31, 2019, the ledger indicates that the balance of the account was negative again by February 6, 2019, Tr., vol. 2, p. 558, however, the account statement reflects that the daily ending balance on February 6, 2019, was positive. Px. 12.

29. After work on the Project began, but before it was completed, disputes arose between the Plaintiff and BJC. Stipulated Facts, at ¶ 14.

30. In July of 2019, the Plaintiff terminated BJC from the Project. *Id.* at ¶ 15.

31. At some point prior to CF terminating BJC from the Project, it was determined that the subflooring was not level and required significant repairs for progress on the Project to continue. *See* Tr., vol. 2, pp. 469–77.

32. Two of BJC's payments to subcontractors were tendered after BJC was fired from the CF Project. Px. 1.

33. On May 27, 2020, the Plaintiff filed the State Court Action, a lawsuit in the Circuit Court of Cook County, Case No. 20 L 005662, styled *Chop Foo, LLC v. BJ Construction Group, LLC*, to recover its damages under the Contract. Stipulated Facts, at ¶ 16.

34. During the pendency of the State Court Action, BJC was involuntarily dissolved. *Id.* at ¶ 17.

35. The Debtor was not a named defendant or otherwise a party to the State Court Action. *Id.* at ¶ 16.

36. In December of 2020, the Debtor incorporated a new business, Klasik Construction, Inc. *Id.* at ¶ 18.

37. On January 8, 2021, the Judgment was entered by default in the State Court Action in favor of the Plaintiff and against BJC in the amount of $620,847.60. *Id.* at ¶ 19.

38. Following entry of the Judgment, Chop Foo attempted to collect the Judgment from BJC. *Id.* at ¶ 20.

39. Chop Foo was unable to collect any portion of the Judgment from BJC. *Id.* at ¶ 21.

40. On April 26, 2021, the Debtor filed the Petition in this court, a chapter 7 bankruptcy petition. *Id.* at ¶ 22.

41. The Plaintiff timely filed this adversary proceeding to determine nondischargeability of the Judgment on July 23, 2021. *Id.* at ¶ 13.

APPLICABLE LAW

A. Dischargeability

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 470 (Bankr. N.D. Ill. 2011) (Sonderby, J.). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); s*ee also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996), *cert. denied*, 519 U.S. 931 (1996). To further the policy of providing a debtor a fresh start, exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *See In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

To succeed in such an action, first, a plaintiff must establish that the debtor owes him a debt. *See Zirkel v. Tomlinson (In re Tomlinson)*, Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.). The court will defer discussion of that issue until part B of the Applicable Law, where the court considers if or how the Debtor might be held accountable under these circumstances.

Second, as section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts, a plaintiff must show that the debt falls within one of the specified grounds under section 523(a). *Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.). As to this latter element, there are two sections at issue here, sections 523(a)(2)(A) and 523(a)(4).

1. *Count I: 11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides, in pertinent part, that an individual debtor is not discharged from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

11 U.S.C. § 523(a)(2)(A).

Three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A): False pretenses, false representation and actual fraud. *Id.*; *see also Deady v. Hanson (In re Hanson)*, 432 B.R. 758 (Bankr. N.D. Ill. 2010) (Squires, J.); *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Goldgar, J.). The court will consider first false pretense and false representation together, then actual fraud.

a.      False Pretenses and False Representation

To except a debt from discharge under section 523(a)(2)(A) based on false pretenses or a false representation, the creditor must establish the following elements: (1) the debtor made a false representation or omission of fact; (2) the debtor (a) knew such statement or omission was false or made the same with reckless disregard for its truth and (b) made the same with an intent to deceive; and (3) the creditor justifiably relied on the same. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010); *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997); *Jahelka*, 442 B.R. at 668–69. A creditor must establish all three elements to support a finding of false pretense or false representation. *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 156 (Bankr. N.D. Ill. 2009) (Squires, J.); *see also Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.). Failure to establish any one fact is outcome determinative. *Hanson*, 432 B.R. at 771 (*citing Jairath*, 259 B.R. at 314).

Under section 523(a)(2)(A), "[f]alse pretenses in the context of section 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression." *Media House Productions, Inc. v. Amari (In re Amari)*, 483 B.R. 836, 846 (Bankr. N.D. Ill. 2012) (Schmetterer, J.) (*citing Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (Squires, J.). The implication arises when a debtor, with the intent to mislead a creditor, engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, . . . or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor . . . ." *Paneras*, 195 B.R. at 406 (internal quotations omitted); *see also Amari*, 483 B.R. at 846.

A false pretense does not necessarily require overt misrepresentations. *Paneras*, 195 B.R. at 406. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*; *see also Hanson*, 432 B.R. at 771 (finding that a false pretense is "established or fostered willfully, knowingly and by design; it is not the result of inadvertence").

In contrast, a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *See Scarpello*, 272 B.R. at 700; *In re Philopulos*, 313 B.R. 271, 281 (Bankr. N.D. Ill. 2004) (Schmetterer, J.); *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). As a spoken or written statement is not required for a false representation, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Hanson*, 432 B.R. at 772 (internal quotation omitted); *see also Scarpello*, 272 B.R. at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Ryan*, 408 B.R. at 157 (*citing Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (Wedoff, J.)).

14

An element common to false representation and false pretense is reliance.  The Supreme Court has clarified that section 523(a)(2)(A) requires only a showing of "justifiable" reliance.  *See Field v. Mans*, 516 U.S. 59, 73–75 (1995); *see also Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995).  Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the creditor's] conduct must conform to the standard of the reasonable man." *Paneras*, 195 B.R. at 406 (*quoting Field*, 516 U.S. at 71).  Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda*, 599 B.R. at 717 (*quoting Field*, 516 U.S. at 71).

Whether a party justifiably relies on a misrepresentation is "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*; *see also Bombardier Capital, Inc. v. Dobek* (*In re Dobek*), 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002) (Schmetterer, J.).  "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (Lefkow, J.) (*quoting Field*, 516 U.S. at 70).  "However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *Johnston v. Campbell* (*In re Campbell*), 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (internal quotations omitted).

Several courts in this Circuit have determined that "[t]o satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *see also In re Mayer*, 51 F.3d 670, 676 (7th Cir. 1995) ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Hanson*, 432 B.R. at 773.  Accordingly, these courts have required the plaintiff to show that the debtor's conduct proximately caused the plaintiff's loss, thus making proximate cause an additional requirement under section 523(a)(2)(A). *See In re Luster*, 50 F. Appx 781, 784 (7th Cir. 2002); *In re Tomlinson*, 1999 WL 294879, at *7; *Microtech Int'l v. Horwitz* (*In re Horwitz*), 100 B.R. 395, 397-398 (Bankr. N.D. Ill. 1989) (Katz, J.).

Recently the Supreme Court has clarified that the misrepresentation under section 523 of the Bankruptcy Code goes to how the debt was obtained, not who made the misrepresentation itself. *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023).  While this leads to obviously unfair results, making a debtor liable for frauds she had no connection to or knowledge of, that decision binds this court.  At first glance, it would appear to call into question the intent precedent discussed above.  If a debtor need not even know of the fraud in question, how can a debtor's intent be relevant? *Id.* at 75 ("Passive voice pulls the actor off the stage.").  That is, of course, an unfortunate turn of phrase.  If intent is an element of fraud, the actor can never truly be off the stage.

Thankfully, *Bartenwerfer* is of little relevance here as the statements in question were those of the Debtor or the Debtor's agent, not some third party.  If such statements meet the criteria set forth above, the Debtor may not discharge any personal liability he has to the Plaintiff.

What is clear, though, is this:  Whether a plaintiff's reliance is justifiable is still a question for the court, as to hold otherwise would allow a plaintiff to elevate any misrepresentation to the level of nondischargeability.  Mere puffery remains inactionable under section 523 of the Bankruptcy Code. *Liebl v. Liebl* (*In re Liebl*), 434 B.R. 529, 539 (Bankr. N.D. Ill. 2010) (Schmetterer, J.).  As the Seventh Circuit has stated, "no person of ordinary prudence and comprehension would rely" on such puffery. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1009 (7th Cir. 2004).

15

b.      Actual Fraud

A different analysis is used when a creditor alleges actual fraud.  In order to except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute.  *Jahelka*, 442 B.R. at 669; *see also Ryan*, 408 B.R. at 157; *Scarpello*, 272 B.R. at 701; *Jairath*, 259 B.R. 308, 314.  The fraud exception to the dischargeability of debts in bankruptcy does not reach constructive frauds, only actual ones.  *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000); *see also Ryan*, 408 B.R. at 157.

Unlike false pretenses and false representations, "actual fraud" does not require proof of a misrepresentation or reliance.  *McClellan*, 217 F.3d at 892; *see also Jahelka*, 442 B.R. at 669; *Hanson*, 432 B.R. at 771.  While there is no definite rule defining fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal quotations omitted).

It appears that *Bartenwerfer* might negatively affect this analysis as well.  Again, if a debtor need not even know of a fraud, *Bartenwerfer*, 598 U.S. at 75, a debtor's intent to defraud is hardly relevant except as is necessary to establish the fraud itself.  Once again, though, the facts make clear that if a fraud existed, it was one implemented by the Debtor.  Thankfully then, *Bartenwerfer* is of no impact here.

c.      Intent

As is noted above, *Bartenwerfer* calls into question years of jurisprudence regarding a debtor's intent in relation to section 523 of the Bankruptcy Code.  Scienter, or intent to deceive, has been for decades a required element under section 523(a)(2)(A) for proving whether the claim is for a false representation, false pretenses, or actual fraud.  *Mayer v. Spanel Int'l, Ltd.* (*In re Mayer*), 51 F.3d 670, 673 (7th Cir. 1995), *cert. denied*, 516 U.S. 1008 (1995); *Pearson v. Howard* (*In re Howard*), 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006) (Schwartz, J.).  Intent to deceive is measured by the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct.  *See Scarpello*, 272 B.R. at 700; *see also CFC Wireforms v. Monroe* (*In re Monroe*), 304 B.R. 349, 356 (Bankr. N.D Ill. 2004) (Schmetterer, J.).  Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made.  *Standard Bank & Trust Co. v. Iaquinta* (*In re Iaquinta*), 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) (Squires, J.).

An intent to deceive may be established through direct evidence or inference.  *Monroe*, 304 B.R. at 356 (*citing In re Sheridan*, 57 F.3d 627 (7th Cir. 1995)).  Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan* (*In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (internal quotations omitted); *see also Hanson*, 432 B.R. at 773.  Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

As noted above, while *Bartenwerfer* removes intent as an independent element of any section 523 analysis, thereby prohibiting debtors from discharging debts arising from frauds which

16

they knew nothing of and had no connection to, *Bartenwerfer* does not remove intent insofar as it is needed to establish the existence of a fraud.  In this context, the fraud in question is actual fraud, not constructive or implied fraud.  As the Supreme Court has stated,

> "[a]ctual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involv[es] moral turpitude or intentional wrong."  *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878).  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality."  *Id.*  *Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."*

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (emphasis added).

Thus, following the Supreme Court's non-*Bartenwerfer* jurisprudence means that intent remains an element of actual fraud, though it may no longer be one under misrepresentation.  This has the effect of making the standard for misrepresentation easier to meet than that of actual fraud, which one might expect, but thereby making make debtors liable for the more innocuous of statements than for more egregious conduct, which one might not.  The result is a whole host of "soft" frauds will be nondischargeable, which appears to be what the Supreme Court intended.

In *Husky*, Justice Sotomayor stated further, "[a]lthough 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely."  *Id.*  "There is no need to adopt a definition for all times and all circumstances here because, from the beginning of English bankruptcy practice, courts and legislatures have used the term 'fraud' to describe a debtor's transfer of assets that … impairs a creditor's ability to collect the debt."  *Id.*

Thus, under section 523(a)(2)(A), fraud, while not precisely defined, is best taken as some sort of intentional act of deception which impairs a creditor's ability to collect a debt, including a fraudulent transfer or conveyance scheme.  *Id.* at 366.

       2.       *Count II: 11 U.S.C. § 523(a)(4)*

Section 523(a)(4) provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny …."  11 U.S.C. § 523(a)(4).

There are, therefore, three separate grounds for holding a debt to be nondischargeable under section 523(a)(4).  While there has been some debate over how to parse this subsection, the Seventh Circuit has made clear that for a debt to be nondischargeable under section 523(a)(4), the debtor must have committed fraud while acting as a fiduciary or have either committed embezzlement or larceny.  *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996).  The court will take them up each in turn.

       a.       Fraud or Defalcation While Acting in a Fiduciary Capacity

At the outset, a successful section 523(a)(4) action under these grounds must sound in either fraud or defalcation.  In keeping with the Supreme Court's discussion in *Husky*, the court must presume that fraud here means both actual fraud and "implied" fraud or fraud "in law," thus

including acts of deception that "may exist without the imputation of bad faith or immorality." *Husky*, 578 U.S. at 360.

Defalcation, on the other hand, is "a word that only lawyers and judges could love." *In re Jahrling*, 816 F.3d 921, 925 (7th Cir. 2016). It "'can be distinguished from fraud and embezzlement on the basis that subjective, deliberate wrongdoing is not required to establish defalcation,' though some degree of fault greater than negligence or mistake, but less than fraud, was required." *Id.* (*quoting In re Berman*, 629 F.3d 761, 766 n.3 (7th Cir. 2011)). As the Seventh Circuit pointed out in *Jahrling, id.*, the Supreme Court clarified the law in *Bullock*, holding that defalcation requires proof of "a culpable state of mind … involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013).

As to the fiduciary capacity, this court has stated that:

> "The existence of a fiduciary relationship under section 523(a)(4) is a matter of federal law." *Berman*, 629 F.3d at 767 (*citing to In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000)). Thus, a party may act in a fiduciary capacity for the purposes of section 523(a)(4) without necessarily falling into the delineated role of fiduciary under applicable state law. While this may appear to give the statute more breadth, in application fiduciary capacity under section 523(a)(4) is construed more narrowly than it might be under state law. *Id.* at 767-68. This is in keeping with the general *proviso* that exceptions to discharge are to be construed narrowly. *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir.1998) ("When deciding whether a particular debt falls within a § 523 exception, courts generally construe the statute strictly against the objecting creditor and liberally in favor of the debtor.").

*In re Manevska*, 587 B.R. 517, 530–31 (Bankr. N.D. Ill. 2018) (Barnes, J.).

Recently, Judge Cleary had the opportunity to opine as to the existence of a fiduciary relationship under circumstances very similar to those at bar. *In re Udelhoven*, 624 B.R. 629, 647 (Bankr. N.D. Ill. 2021) (Cleary, J.). Quoting the District Court, he stated that "[n]ondischargeability cannot be based on a mere failure to keep a promise, such as a mere contractual breach." *Id.* (quoting *Richeson v. Saltzman (In re Saltzman)*, Case Nos. 95 B 1522, 95 A 424, 96 C 5448, 1997 WL 539660, at *7 (N.D. Ill. Aug. 22, 1997) (citations omitted), *aff'd*, 142 F.3d 440 (7th Cir. 1998). In examining the *Udelhovan* and *Saltzman* cases, the court is struck by the parallels between those and this case. In each, disgruntled customers attempted to conflate a contractual dispute against a contractor to a finding of nondischargeability. In each, the customer/plaintiff made a variety of arguments including misrepresentation, fiduciary relationship, embezzlement and fraud. In each, the customer/plaintiff's nondischargeability complaint failed in the face of the existing contractual relationship.

      b.    Embezzlement

Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (*quoting Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895)). Embezzlement requires a

18

showing that: (1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit. *Pierce v. Pyritz,* 200 B.R. 203, 205 (N.D. Ill. 1996). Using access that has been granted to funds to misappropriate those funds constitutes embezzlement. *Zamora v. Jacobs (In re Jacobs),* 403 B.R. 565, 575 (Bankr. N.D. Ill. 2009) (Sonderby, J.).

*Manevska,* 587 B.R. at 534.

c.     Larceny

For the purposes of section 523(a)(4), larceny is defined by federal common law. *In re Rose,* 934 F.2d 901, 903 (7th Cir. 1991).

"Larceny requires a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent." *John Deere Co. v. Broholm (In re Broholm),* 310 B.R. 864, 877 (Bankr. N.D. Ill. 2004) (Schmetterer, J.) (*citing id.* at 903). The intent required for larceny is specific. *In re Marshall,* 623 B.R. 123, 135 (Bankr. E.D. Pa. 2020). It requires more than proving general deceit.

Again, for the same reasons, the facts simply do not support a finding of larceny. *Udelhoven,* 624 B.R. at 651.

B.     Debt

One of the more challenging aspects of the Plaintiff's case is establishing that the Debtor owes any debt at all to it. After all, as noted above, the Judgment is by default in an action that did not include the Debtor.

A proof of claim (presumptively allowed) would have established a debt, though no claim has been filed. The Debtor's is a no asset case, so creditors did not have to file claims. Fed. R. Bankr. P. 2002(e); *Stolfo v. Kindercare Learning Ctrs, LLC (In re Stolfo),* 727 F. Appx. 861, 865 (7th Cir. 2018). The Debtor did schedule that claim as a nonpriority unsecured claim, *see* Schedule D, § 4.2 [Dkt. No. 1], and the Debtor did not check any of the contingent/unliquidated/disputed boxes. *Id.*

Though the Plaintiff did not ask this court to take judicial notice of the judgment in the State Court Action, the rules of evidence permit a court to take judicial notice *sua sponte.* Fed. R. Evid. 201(c)(1). Could the court take judicial notice of the existence of the scheduling of the debt and of the judgment on the docket of the State Court Action? Yes, and the Amended Complaint provides sufficient information for the court to do so. Fed. R. Evid. 201(b); *Guar. Bank v. Chubb Corp.,* 538 F.3d 587, 591 (7th Cir. 2008) ("a court is of course entitled to take judicial notice of judicial proceedings").

That is not entirely necessary here. The parties have stipulated as to a debt between the Plaintiff and BJC, but no further. Stipulated Facts, at ¶ 19. Such stipulation and judicial estoppel do not result in a finding by this court that the Judgment is one arising out of fraud, however. That would go beyond what the parties have stipulated to and beyond what judicial notice of a default judgment would allow.

As the Seventh Circuit has made clear, "a default judgment is normally not given preclusive effect under the collateral estoppel doctrine because no issue has been 'actually litigated.'" *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994) (*citing In re Cassidy*, 892 F.2d 637, 640 n.1 (7th Cir.), *cert. denied*, 498 U.S. 812 (1990)).  By the same token, as the Debtor was not a party to the State Court Action, absent a finding that the Debtor and BJC are alter egos (see below), the Debtor was not fully represented in the prior action and cannot be estopped thereby.  *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 (7th Cir. 1995).

Judicial notice would at best then affirm the existence of the Judgment, though not its contents.  As one court has written:

> Regardless of the source of the records, and regardless of the extent of authentication offered, judicial notice under Rule 201 is limited to adjudicative facts, not documents.  *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *In re Harmony Holdings, LLC*, 393 B.R. 409, 413 (Bankr. S.C. 2008) (quoting *In re Earl*, 140 B.R. 728 n.2 (Bankr. N.D. Ind. 1992)) ("Courts realize that there is a very crucial distinction between taking judicial notice of the fact that an entity has filed a document in the case, or in a related case, on a given date, i.e., the existence thereof, and the taking of judicial notice of the truth or falsity [of the] contents of any such document for the purposes of making a finding of fact.") (internal quotation marks omitted).  "In effect, when presented with a document to be judicially noticed, the document is just supporting information for the 'fact' sought to be noticed: that a particular event occurred."  *Tate v. Univ. Med. Ctr. of S. Nev.*, No. 2:09-cv-01748-JAD-NJK, 2016 U.S. Dist. LEXIS 166603 at *20, 2016 WL 7045711, at *6 (D. Nev. Dec. 2, 2016).

*In re Manning*, 620 B.R. 199, 207 (Bankr. W.D.N.Y. 2020).  Judicial notice of the Judgment might suffice to establish a debt that is owed to the Plaintiff by BJC, but no more.  And that fact has already been stipulated to.

The parties' Stipulated Facts do not go so far as to agree as to whether fraud existed as between BJC and the Plaintiff.  Further, the Plaintiff has not asked the court to take the Debtor's scheduling of the Debt as preclusive in any manner and the court declines to do so *sua sponte*.  *Accord Pavelka v. Allstate Prop. & Cas. Ins. Co.*, 91 F. Supp. 3d 931, 938 (E.D. Mich. 2015) (finding no issue with a debtor's different scheduling of the same debt in two successive bankruptcy cases and discussing in detail how judicial estoppel or preclusion might or might not apply).

So, while there is a debt owed by BJC, the nature of that debt is undetermined and, as the Debtor was not party to the State Court Action, the nature of the debt would not be preclusive on the Debtor even it were.  All that binds here is his stipulation that a debt existed between the Plaintiff and BJC.

That leaves the Plaintiff with the requirement of establishing a debt owed by the Debtor to the Plaintiff.[13] It could do so in one of two ways. It could show that the Debtor is vicariously responsible for BJC's liability to the Plaintiff through a theory such as veil piercing, as discussed briefly above, or it could show that the Debtor is directly liable to the Plaintiff. The court will consider each in turn.

1.      *Veil-Piercing/Alter Ego Theory*

While one way in which the Debtor might be held liable for BJC's indebtedness to the Plaintiff is, of course, obvious and has been previously mentioned—if the Plaintiff can establish that BJC was the Debtor's alter ego, then BJC's debts are indistinguishable from the Debtor's debts. This is unquestionably the theory on which the Plaintiff seeks to proceed, though it has not been given the attention by the Plaintiff that it might have deserved.

This court has discussed veil piercing in previous opinions, stating:

> Piercing the corporate veil is not favored and in general, courts are reluctant to do so. *See In re KZK Livestock, Inc.*, 221 B.R. 471, 478 (Bankr. C.D. Ill. 1998) (citing *CM Corp. v. Oberer Dev. Co.*, 631 F.2d 536 (7th Cir. 1980)); *In re Kevin W. Emerick Farms, Inc.*, 201 B.R. 790 (Bankr. C.D. Ill. 1996). Accordingly, a party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a "dummy or sham" for another person or entity. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App.3d 1084, 215 Ill. Dec. 931, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996).

*In re Montalbano*, 486 B.R. 436, 445 (Bankr. N.D. Ill. 2013) (Barnes, J.).

As the Seventh Circuit has written, "veil-piercing allows a corporation's creditors to reach the *owner's* personal assets when the owner completely disregards corporate formalities such that it would be inequitable to sustain the fiction of separate personhood for corporations." *In re Wolf*, No. 23-1045, 2023 WL 6564882, at *4 (7th Cir. Oct. 10, 2023) (*citing Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995)) (emphasis in original). "Under Illinois law, courts will pierce the corporate veil only when, first, there is 'such unity of interest and ownership that the separate personalities [of the corporations] no longer exist' and, second, when circumstances are 'such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Great Lakes Overseas, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 990 F.2d 990, 996 (7th Cir. 1993) (quoting *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991)).

Recently and more specifically, the Seventh Circuit has stated that Illinois courts consider the following factors when undertaking a "unity of interest" inquiry:

---

[13]      It could be argued that *Bartenwerfer* removes even this requirement if it in fact removes the actor from the stage. *Bartenwerfer*, 598 U.S. at 77. But that cannot be the case. If the debt is not connected to the Debtor, the court has no business ruling on its nondischargeability. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022) ("Article III of the Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'") (citing U.S. Const. art. III, § 2)); *Internal Revenue Serv. v. Wallace*, No. 23-CV-1331-JES, 2023 WL 7360835, at *4 (C.D. Ill. Nov. 7, 2023); *In re J Publ'n Co.*, 656 B.R. 221, 224 (Bankr. N.D. Ill. 2023) (Cassling, J.) (discussing each of the foregoing).

21

(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (*quoting Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005)).  As *Judson* makes clear, the theory in question is truly that of veil piercing.  Whether the entity in question was an alter ego of another is more the sum of several of the *Judson* factors.

As to commingling of funds, the Seventh Circuit states, "the use of a cash management system alone is not evidence that funds are being improperly commingled." *Judson*, 529 F.3d at 380. In *Judson*, the commingling of a corporate debtor's accounts with that of its corporate parent and that parent's principal was deemed insufficient under the facts to constitute grounds for veil piercing under Illinois law.  *Id.*

All of this is made more difficult because, as was noted above, the Plaintiff failed to plead veil piercing or alter ego as an independent count in its Amended Complaint.  While, as discussed, the court can infer that Counts I & II are predicated on such a theory, by failing to plead any of the eleven factors listed by the Seventh Circuit, the only factors even indirectly implicated by the Plaintiff at Trial were the first, fifth, eighth and ninth.  All of these have to do with BJC's poor cash management which, albeit shoddy, does not rise to the level required by *Judson*.  The Plaintiff failed to show that BJC was inadequately capitalized or was insolvent at the time of the transactions in question here, and failed to show that poor cash management was to the detriment of BJC's creditors.  In fact, while the books and records indicated that BJC had gone negative on more than one occasion, the Plaintiff did not cite those occasions, and in such instances, money was promptly deposited.  Px. 12.  In short, the Plaintiff has failed to show that it may proceed on a veil piercing theory.

2.    *Direct Participant Liability*

In the absence of veil piercing, both of the Amended Complaint's remaining Counts would fail, but for one additional theory that can be inferred from the Plaintiff's case at Trial.  That is direct participant liability.  As the Seventh Circuit has stated,

The Illinois doctrine of direct participant liability provides that a parent company may be liable for the alleged wrong of its subsidiary when the "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management." *Phillips*, 2012 WL 6111405, at *9, quoting *Forsythe v. Clark USA, Inc.*, 224 Ill.2d 274, 309 Ill. Dec. 361, 864 N.E.2d 227, 235 (2007) (recognizing doctrine in negligence case).

*Northbound Group, Inc. v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015); *accord Bank of Commerce & Trust Co. v. Strauss (In re Strauss)*, 523 B.R. 614, 632 (Bankr. N.D. Ill. 2014) (Goldgar, J.) ("A corporate

22

officer who participates actively in the fraud of his corporation can be held personally liable, and the resulting debt will be nondischargeable in the officer's bankruptcy case."). The same principle applies to limited liability companies. *In re Krook*, 615 B.R. 479, 484 (Bankr. N.D. Ill. 2020) (Goldgar, J.).

The Seventh Circuit noted a limitation on this theory, though, one which will be discussed in more detail below. That is "that Illinois courts have applied this theory of direct participation to torts or violations of statutes, not to breaches of contract." *Northbound Group*, 795 F.3d at 651.

Of course, if the Debtor actively and directly defrauded the Plaintiff, the debt is nondischargeable. But if fraud was on the part of BJC and not the Debtor but the Debtor, the principal of BJC, nonetheless actively participated in that fraud, the Debtor cannot escape liability even if the elements of veil piercing are not met. *Accord Bartenwerfer*, 598 U.S. at 83.[14]

As BJC was already found to be liable by the Judgment, if the elements of section 523(a)(2)(A) and section 523(a)(4) are met, the debt is nondischargeable as to the Debtor as the Debtor was a direct participant in what occurred between BJC and the Plaintiff. But the Plaintiff must still meet these requirements of liability on the debt for that to occur.

DISCUSSION

A.      The Essence of the Plaintiff's Action

Considering all of the foregoing, it is necessary to take stock of the Plaintiff's essential allegations against the Debtor. The Plaintiff was contractually paired with BJC, not the Debtor. The Plaintiff has not alleged and, in any event, has offered no evidence that there was fraud or misrepresentation with respect to the initial Contract. Put another way, there is no allegation of the existence of fraud or misrepresentation in the inducement of the Contract and the court cannot independently find that there was. As a result, the terms of the Contract remain in force between the parties to it and must be considered when determining the propriety of the Debtor's alleged actions. *Cannon v. Burge*, 752 F.3d 1079, 1093 (7th Cir. 2014).

The Plaintiff's theory is that the labels on BJC's ledgers and accounts (*e.g.*, general versus subcontractor) is objectively meaningful. The court cannot conclude the same. There was no evidence provided that funds paid by clients needed to be handled by BJC in any specific manner. The contract between the Plaintiff and BJC has no provisions requiring the same. As such, there is no way for the court to conclude that BJC's use of the funds, though clearly not well managed, constituted improper commingling. *Judson Atkinson Candies*, 529 F.3d at 380. Despite repeated characterizations by the Plaintiff's counsel of funds in BJC's accounts as "client funds," these funds

---

[14]     While *Bartenwerfer* also included a question of preclusion in a fraud judgment against a husband imputed to his wife regarding the co-ownership of the property on which the fraud occurred, the court cannot determine that the Supreme Court meant to abrogate the preclusion factors by its ruling therein. Absent a theory such as alter ego, even if it could be shown that a debt arose out of fraud, if that finding of fraud is not preclusive on the Debtor but only on an affiliate of the Debtor, the Plaintiff must still prove fraud for a section 523 action to succeed.

were BJC's property upon payment. Though evidence abounds that BJC's cash management control was abysmal, how BJC handled its funds has no direct bearing on the Plaintiff.

The Debtor testified that he took no salary. BJC's ledgers indicate, however, that the Debtor did charge to the business accounts a variety of expenses and transferred on occasion funds to his personal checking account. Some of those expenses were substantial, including for example at least $16,000 in payments toward the Debtor's vehicle, a Porsche SUV. Though such expenditures tend to raise eyebrows and BJC's cash management practices were at best, chaotic, and although the Debtor's characterization of some of expenses paid out of the BJC's accounts as business expenses appear far-fetched, they are not entirely implausible.

Some are clearly not business expenses (*e.g.*, $9,000 of the cost of his wedding), however, and the funds transferred to the Debtor's personal account were clearly by way of compensation. This is still not enough, however.

There is no hard and fast rule that the principal of a company is prevented from taking compensation sporadically or compensation in kind. Further, the implication that the Plaintiff would have the court draw, that such usage caused the debtor to spend beyond funds available, is hard to draw from the evidence provided. While the Plaintiff spent considerable time addressing ledger entries from BJC's business accounts, some of which did result in negative balances in the ledger, the Plaintiff also provided account statements and, as best as the court can determine, BJC's account statements actually reflect a positive daily ending balance on those occasions. Further, though some commingling clearly occurred, the evidence makes clear that the Debtor did maintain separate personal accounts.

True, however, that the use of the business accounts of BJC to fund the Debtor's personal expenses might be problematic if such expenses were being paid when BJC was insolvent, but as noted above, no actual evidence of the same has been provided. There is frankly no evidence that the Debtor's movement of funds in BJC's accounts had any bearing on the Plaintiff or on BJC's solvency.

This is even more telling when considering that all of the Plaintiff's allegations against the Debtor are that the Debtor actively participated in the fraud, either by making misrepresentations directly to the Plaintiff or its representatives or by supervising and/or directing someone to do the same. As a result, the veil-piercing that has not been established is simply not needed. It is not necessary for the Plaintiff to pierce the veil from BJC to the Debtor, the Debtor is culpable directly. *Northbound Group*, 795 F.3d at 651; *Strauss*, 523 B.R. at 632; *see also Krook*, 615 B.R. at 484.

With this in mind, the court will consider each of Count I and Count II.

1.      *Count I – 523(a)(2)(A)*

As noted above, for a debt to be nondischargeable under section 523(a)(2)(A), a plaintiff must show that she justifiably relied on a material misrepresentation that was the cause in fact of the debt sought to be excepted from discharge or that the debt in question arose out of fraud. The court will consider each, in turn.

24

a.     The Alleged Misrepresentations and the Plaintiff's Reliance on the Same

The Plaintiff alleges two essential categories of misrepresentation by the Debtor:  That the Debtor (or Blackburn under the Debtor's supervision) misrepresented the percentage completion of the Project in order to prematurely trigger percentage payments under the Contract; and that the Debtor (or Blackburn under the Debtor's supervision) misrepresented the status of the Project with respect to payments to subcontractors.

The problem with the former theory is that the Plaintiff has failed to show that BJC or the Debtor misrepresented the percentage completion of the project.  True, the Debtor or someone at his behest did inform Mertz that the Project "was approaching" a certain milestone or a certain percentage of completion and requested payment commensurate with the same.  Pxs. 6, 7.  Such statements, especially couched in the qualifying language of that used, appear to either have been accurate or, to the extent inaccurate, were mere puffery.  Nothing offered by the Plaintiff by way of evidence has convinced the court that such representations were material misrepresentations.  The percentage completion of the Project is always going to be a subjective measure as such projects have moving parts that defy objective quantification.  This Project in particular had unexpected costs and delays associated with the unlevel floor and the fire damage.  Tr., vol. 2, pp. 428, 469–77.  Whether completion of the Project was X% or Y% at any given moment is a subjective measure.  While Blackburn communicated that the Project was "near completion of the framing of both units," Px. 7, the statement was qualified and not shown to be untrue.  Again, this statement is qualified and, to the extent inaccurate, was mere puffery.

This is complicated by the Contract's failure to provide a more definitive definition of each stage.  In reading the Contract, it does appear that there may have been a schedule that might have given guidance regarding how a given stage might be measured.  Unfortunately, the Plaintiff has failed to provide that addendum.

What this underscores, however, is that the dispute between the Plaintiff and BJC was a contract dispute and the law is clear that, in the face of a contract, a misrepresentation needs to be "related to inducing the [plaintiff] to make payments outside the contract." *Richeson v. Saltzman*, Case No. 97-3450 1998 WL 152987, at *4 (7th Cir. 1998).  The Plaintiff does not challenge the validity of the Contract and all payments, including the one payment that was for changes, appear to have been made thereunder.  Further, the vagueness of the Contract does not favor the Plaintiff.  The court cannot conclude that BJC, the Debtor or anyone at the Debtor's behest materially misrepresented the state of the Project in order to induce payments outside of the Contract.  *Id.*  This theory fails.

As to the latter, though not well articulated, the Plaintiff appears to be arguing that the Debtor objectively lied when he (or Blackburn at his direction) informed Mertz that the subcontractors had been paid and that BJC therefore needed the next payment per the Contract.  Again, this at best occurs in the face of the Contract, and Plaintiff's claims are about payments made under the contract.  There was no payment outside of the Contract that was challenged at Trial.  *Id.*

Even if there were, the status of the payment of the subcontractors was never made clear to the court.  While the Plaintiff has shown that Blackburn communicated to him on November 27, 2018, that BJC would "need to start providing [BJC's] sub-contractors their first payments to begin their work" and that BJC would "be placing orders for windows," Px. 6, a representation that payments needed to be made is not the same thing as a representation that the subcontractors had

25

been paid. Later, on January 24, 2019, Blackburn represented that "the MEP (mechanical, electrical, plumbing) trades … [had] all received their initial deposits and [would] now be needing their second payments before beginning their work (50% of their total contract cost)." Px. 7. But the it was not shown to the court what the amount of those initial deposits was and the Plaintiff's own exhibits show that BJC was in fact making payments to subcontractors—including after BJC was terminated from the Project.

Once again, this theory reflects a mere dispute between the Plaintiff and BJC under the Contract and regarding payments outside the contract. *Saltzman*, 1998 WL 152987, at *4. The court cannot conclude that BJC, the Debtor or anyone at the Debtor's behest materially misrepresented the state of payments to the subcontractors to induce payments outside of the Contract. This theory also fails.

   b. Fraud

The Plaintiff's fraud claim fares no better. Recall that, to establish fraud, a plaintiff must show that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669.

Here, the court is not convinced that a fraud occurred. For the same reasons that the court cannot find a misrepresentation, there simply are not the indicia of fraud here that the Plaintiff would need to succeed. The court sees no surprise, trick, cunning, dissembling or unfair act cheating the Plaintiff out of what it was due. *McClellan*, 217 F.3d at 893. There is no indication of bad faith or immorality. *Husky*, 578 U.S. at 360. At best, the court would have to impute the same and that, as the Supreme Court made clear, is not within the purview of actual fraud. *Id.* But as noted above, any misrepresentation here was either puffery or within the scope of an existing contract binding BJC and the Plaintiff. There is nothing here that indicates anything was done to induce the Plaintiff to make a payment outside of that Contract. *Saltzman*, 1998 WL 152987, at *4. As a result, this theory also fails.

   2. *Count II*

   a. Fraud/Defalcation in a Fiduciary Capacity

Even less ought to be said about the Plaintiff's section 523(a)(4) Count, but for the question that the Plaintiff does not even ask.

Having established no fraud, what remains is defalcation. As noted above, defalcation is "a word that only lawyers and judges could love." *Jahrling*, 816 F.3d at 925. Here, given the looseness of the definition of defalcation, *Bullock*, 569 U.S. at 269 ("a culpable state of mind …. involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."), it might be possible for the Plaintiff to demonstrate at least some gross recklessness on behalf of BJC, Blackburn or the Debtor, but Plaintiff comes nowhere near establishing a fiduciary relationship necessary to substantiate this count.

The Plaintiff has failed to provide anything in support of the Debtor having any fiduciary relationship with BJC or the Plaintiff. There was no evidence of a trust. The Debtor was the principal of BJC, to be sure. He also, through BJC, took funds from the Plaintiff and used them for his own benefit. But as noted above, nothing in the Contract or otherwise required BJC or the

26

Debtor to hold those funds in trust. Absent express terms establishing that relationship, the existence of a mere contractual relationship is insufficient.

As in *Udelhoven*, the Plaintiff would not have succeeded on a "zone of insolvency" or "deepening insolvency" type theory, even if it had attempted to prove the elements. *Id.* at 650 n.2 (citing to *Berman*, 629 F.3d at 766-67 (rejecting same)). Here, like in *Berman*, the Plaintiff did not show that BJC was insolvent at the time that the representations or payments were made. The Seventh Circuit in Berman, however, found that that did not matter as the theory itself was unsound under Illinois law. *Berman*, 629 F.3d at 767. The Plaintiff would not succeed on such a theory, nor has it made any effort to establish the type of "special confidence" relationship that might otherwise cause such a relationship to arise. *Follett Higher Educ. Group, Inc. v. Berman*, 427 B.R. 432, 436 (N.D. Ill. 2010), *aff'd* 629 F.3d 761 (7th Cir. 2011). At best, the Plaintiff did attempt to show Mertz's lack of sophistication with respect to agreements such as the Contract here. But that lack of sophistication does not elevate the parties' contractual relationship to one of fiduciary duty. Without more, an ordinary contractual relationship does not establish "a fiduciary relationship within the meaning of section 523(a)(4)." *Berman*, 629 F.3d at 771.

As a result, the Debtor was not in a fiduciary relationship so as to make section 523(a)(4) applicable, and this element of Count II must fail.

b.      Embezzlement

Here, the facts simply do not support a finding of embezzlement. As discussed, the funds the Debtor took from BJC were not the Plaintiff's. They became BJC's property upon payment to it. There was no trust. Those funds were BJC's to do with as it pleased and the Debtor, as the principal of BJC, was entitled to take and use those funds. *Udelhoven*, 624 B.R. at 651 ("[The debtor] could not embezzle money that belonged to him.").

This element of Count II must also fail and, as a result, judgment on Count II in favor of the Debtor must be rendered.

CONCLUSION

For the reasons stated above, judgment will be entered in favor of the Debtor on Count I and Count II of the Amended Complaint. As Count III of the Amended Complaint was previously dismissed, this judgment concludes the Adversary.

Dated: September 30, 2024                                    ENTERED:

_____
Timothy A. Barnes, Judge
United States Bankruptcy Court

27